Drake, Oh. J.,
delivered the opinion of the court:
This case presents the third development of that most extraordinary scheme of conspiracy and fraud which was acted out in the city of Boston on the 28th of February and the 1st of March, 1867, between Edward Carter, a broker, the chief party, of the firm of Mellen, Ward & Co., and Julius F. Hartwell, the cashier in the office of the United States Assistant Treasurer in that city. Two other branches of that scheme have been before this court, in The State National Bank of BostoNs Case (10 . C. CJs. B., 519) and The First National Bank of NewtoNsOase (16 C. Cls. B., 54), each of which was connected with transactions that took place on the 28th of February. The present case involves the history of a single hour on the morning of the 1st of March, and discloses facts, not as complicated, but almost, if not quite, as remarkable as those detailed in those two cases. That bistory is set forth in minute detail in the finding of facts; but we give here a condensed statement of it.
*342 Prior to February 28, 1807, Carter bad induced Hartwell to let him have out of the sub-treasury money of the United States to the amount, first and last, of a million to a million and a quarter dollars, to aid Carter in a stock speculation. In anticipation of the regular monthly examination, by government examiners, of the funds in the sub-treasury, which would take place on' the 1st of March, Hartwell insisted on Carter’s paying back to him, before or on the 28th of February, the whole amount which Hartwell had let him have; promising Carter that as soon as the examination should be over he would let him have it again. On the 28th Carter put into Hartwell’s hands all of that amount, except $157,000, which he promised to give him the' next morning. A few minutes after nine o’clock on that morning, Carter went to the claimant’s banking-house, and asked Smith (the claimant’s cashier) for the bank’s draft on New York for $125,000, and promised to give him immediately, in return, Mellen, Ward & Co.’s draft on New York for the same amount, with $100,000 in United States gold certificates, or else Adams Express Company’s receipt for that amount in gold. Upon the faith of this promise Smith drew and delivered to Carter his draft, as cashier, on the Manhattan Company, New York, for $125,000, payable to the order of Mellen, Ward & Co. This was all that then took place between Carter and Smith; but it is found that in that interview nothing was said by Carter about there being any deficiency in the sub-treasury for which he was responsible; nor about his desiring to use the draft to help make good a deficiency there; nor about his purpose in obtaining the draft; and there is nothing tending to show that Smith, at any tiipe before or during that interview,, had any knowledge or intimation of the preceding transactions between Carter and Hart-well. To every intent, Smith issued the draft simply and solely on the faith of Carter’s promise.
Carter immediately delivered the draft, together wi th $32,000 in currency, to Hartwell, who was wholly ignorant of the means by which tile draft had been obtained from Smith; and Hart-well immediately delivered both draft and money to the chief clerk of the sub-treasury, George D. Whittle; to whom, the afternoon before, he had, without Carter’s knowledge, divulged the whole matter of his transactions with Carter.
Whittle objected to receiving the draft, because the govern *343 ment regulations required that the sub-treasury should receive nothing but gold, silver, legal-tender notes, or national-bank notes; and directed Hartwell tó go out and procure the needed amount in currency. This Hartwell endeavored to do, applying at several banks to obtain currency for the draft, but without success; and then, in the hope of getting currency for smaller ■drafts, he exchanged it for three drafts of the Eagle National Bank, one for $75,000 and two for $25,000 each; which he took and delivered to Whittle; who went out and sold the •drafts to the Second National Bank of Boston, obtaining therefor $125,000 in currency, which he placed in the hands of the examiners. It is found that Whittle had no knowledge or notice of the consideration or means by which the draft for $125,000 had been obtained from Smith.
Afterwards the claimant voluntarily paid to the Eagle National Bank the amount of that draft; and now sues the United •States to recover it back from them, as so much of its money received by them which ex cequo et bono they ought not to keep from it.
There is,'in our judgment, not the least ground upon which to base such a- claim. To sustain it would be to disregard the plainest principles of -law applicable to transactions between men in negotiable securities; principles which need not be arrayed here; for they enter into the most simple and elementary legal knowledge of courts and lawyers.
If it be claimed that Carter obtained the draft from Smith ■by fraud and without any consideration, the answer, assuming that to be so, is fourfold: 1. That that was a defense, if available at all, against the payment of the draft; and the draft is not in litigation here; 2. That when the claimant found the draft in the hands of the Eagle National Bank, it was bound then to set up whatever defense it could urge against the payment of it; 3. That having voluntarily paid the draft to that bank it abandoned every defense; and 4. That that defense would have availed nothing against a holder of the draft for value, without notice of its having been obtained by fraud and without consideration.
If it be urged that the government has received money of the claimants, the answer is that such is not the fact. The sum of $125,000, which went into the sub-treasury, was not received ■or derived from the claimant, but from the Second National *344 Bank, and was tbe proceeds of a bona fide sale, not of the claimant’s draft, but of the three drafts of the Eagle National Bank, which had in good faith been given for that draft.
The case, in its present shape, has no better foundation than it would have had if Carter had, by false and fraudulent representations, borrowed $125,000 in money from the claimant through its cashier, and paid the money to Hartwell, and Hart-well, without any knowledge of the fraud, had paid it into the sub-treasury. No court would for a moment entertain the proposition that the claimant could, under such circumstances, reclaim the money from the government.
But we need not press conclusions any further to show how devoid of merit is this claim.
Such being our view of it, it is needless to discuss the question as to the effect of the claimant’s having received $30,000' from the securities of Smith.
The judgment of the court is that the petition be dismissed.
Nott, J., was not present at the hearing of this case, and took no part in its decision.