Richardson, Ch. J.,
delivered the opinion of the court:
This is the fourth action brought to tr-ial here growing out of what was called, in an opinion in a former case, “ that most extraordinary scheme of conspiracy and fraud which was acted out in the city of Boston, on the 28th of February and the 1st of March, 1863, between Edward Carter, a broker, the chief party of the firm of Mellen, Ward & Co., and Julius F. Hart-well, the cashier in the office of the United States assistant treasurer in that city.” The cases are The State Bank Case (10 C. Cls. R., 519), The First National Bank of Newton Case (16 C. Cls. R., 54), and The State National Bank Case (17 C. Cls. R., 329).
In the first case, which was instituted by the present claimant, the findings by the court set out with great minuteness the facts upon which this action is founded, and other transactions with which they were closely connected up to the date of the petition in that case. The record therein was admitted in evidence in this case by stipulation of counsel on both sides. We have adopted the findings in that case, no objections to them having been offered by the defendants. One finding (the 26th), *500 specially relating to the present claim, independently of the general transaction, has been’added.
The ultimate facts, in brief, are these: Carter, one of the firm of Mellen, Ward & Go., brokers, in Boston, had fraudulently obtained from the sub-treasury in that city, through Hartwell, the cashier, loans of gold in different sums at different times, until in February, 1867, the firm was indebted to the Government to the extent oí $940,000, for funds thus fraudulently loaned to them. Early in February, Hartwell, who had become alarmed at the situation, informed Carter that he had decided to have a special examination of the funds in the sub-treasury on the 1st of March, and that all the money must be returned by the22d of the month, and this Carter promised should be done.
On the morning of the 28th day. of February Carter, having paid in, with money apparently of the firm, $360,000, proceeded to consummate a scheme which he had worked out in his own mind alone, so far as it appears, for supplying the balance.
The successive steps of his scheme seem to be these, relying upon making a dupe of Smith, cashier of the State National Bank, through whom'to carry them out: First, to arrange with Smith to purchase in the name of the bank a sufficient number of gold certificates of deposit issued by the Government, with the view of holding them for a few days until Carter could pay for them or for the proceeds. /Second, while these certificates were in the possession of the bank, to induce Smith to exchange them for gold at the sub-treasury, taking them there February 28, leaving them one day for verification, and the next day, March 1, to draw the gold. Third, to have an understanding with Hartwell that the certificates should be passed to the credit of Mellen, Ward & Co., without the knowledge of Smith, and so make their account good until after the official examination on the latter day. Fourth, after the official examination that Hartwell should renew his fraudulent loan to Mellen, Ward & Co., by which the State National Bank would be paid, and the fraud would remain undiscovered for the time being at least..
The scheme was successful up to the point of putting the gold certificates into the sub-treasury, when it came to an end through disclosure by Hartwell. The assistant treasurer retained the certificates and the State National Bank was not permitted to withdraw the gold.
*501 We will briefly review how the scheme was worked.
By means which are minutely set oat in the findings, but which it is not necessary to recite here for a general understanding of the case, Carter induced Smith, cashier of the State Bank, to pay for and hold certain gold certificates which he had bargained for with banks — first, eighty-four certificates, of $5,000 each, amounting to $420,000. Then, on the 28th day of February, about 2 o’clock p. m., as stated in the findings—
“ XV. Carter and Smith went together to the assistant treasurer’s office, and Smith laid the package of certificates on the ledge, at the opening of the cashier’s desk, through which money is passed to the cashier.
“ When Smith laid the certificates down on the ledge Carter took them and pushed them.through the opening to Hartwell, the cashier, and Carter said to Hartwell, “ We wish to deposit this money on account of the gold certificates transaction,” and asked Hartwell to give a receipt for the same. Hartwell asked him, “In what form1?” Carter replied, “In'the usual form.” Hartwell then took the certificates,turned to his desk and wrote a receipt, which he passed out to Carter, and Garter handed it to Smith.
“ On examining this receipt, when Carter handed it to him, and finding it made payable to Mellen, Ward & Co., or order. Smith asked Carter why it was made payable so, instead of to him, Smith. Carter replied, because he, Carter, was the party engaged to make the transaction; but that he would indorse the receipt over to Smith, which he did on the spot, by writing on the back of it; “ Pay only upon the order of O. H. Smith, cash._ Mellen, Ward & Go. Boston, Feb. 28, 1867.”
“ When this indorsement was made, Carter and Smith left the sub-treasury, and Smith went to the State Bank.”
Smith, at about 2.15 o’clock on the same, day, next obtained by purchases made through Carter more gold certificates to amount of $160,000. Then followed what is thus stated in the findings:
“XVII. Immediately after this second visit of Carter and Smith to the Merchants’ Bank, Smith went with Carter to the Second National Bank, where he certified as good a check of Mellen, Ward & Go. on the State National Bank for $125,000, and received from the Second National Bank gold certificates to the amount of $100,000.
“XVIII. Having in bis possession $160,000 in gold certificates, which he had received, as stated, after the deposit in the sub-treasury of the $420,000, Smith again went with Carter to the sub-treasury to make a deposit as before. They found the doors closed for the day. Carter said that he could make the *502 deposit, and Smith handed him the certificates, and Carter went into the treasury, leaving Smith outside, and in a few moments returned to Smith with a receipt, signed by Hartwell, but not as cashier. Smith objected to it on that account, and Carter returned with it into the treasury and brought it back to Smith signed as Smith requested, and Carter immediately there indorsed the same over to Smith.”
Hartwell having thus secured, as he supposed, full payment of Carter’s loans and made his own accounts good as cashier, disclosed the whole matter to the chief clerk, George D. Whittle, who gave a decided negative to the suggestion of allowing Mellen, Ward & Co. to continue their fraudulent loan, and who closed the sub-treasury against the conspirators as well *as against Smith, their dupe. The findings show what was done immediately thereafter. It is ouly necessary to say that the receipts given to Smith were never paid by the United States, and the gold was never delivered, as Smith had exnected it would be.
On January 11,1872, the State National Bank brought its first action in this court to recover $480,000 as the proceeds of certificates to that amount claimed to have been thus fraudulently converted by the cashier to the use of the United States. Judgment was rendered in favor of the claimant for that amount, and on appeal the same was affirmed by the Supreme Court (10 Ct. Cls. R., 519, and 96 U. S. R., 30). The judgment was paid under an appropriation 'therefor by Congress (20 Stat. L., 116).
It will be seen that while the gold certificates of the State National Bank, which were thus converted, amounted to $580,000, the first action was brought to recover for but $480,-000. The certificates omitted to the amount of $100,000 were those obtained by Smith of the Second National Bank upon a check drawn by Mellen, Ward &• Co. on the State National Bank, and certified by Smith to be “good,” as set out in Finding XVII, just above quoted, and the same for which this action is brought.
At the time of bringing the first action the State National Bank had not paid that check, and was resisting its enforcement. The bank undertook to repudiate the transaction of Smith, denying his authority to bind it by his certification of the check, and so did not claim to own the $100,000 certificates for which it was given. -An action was brought upon the check *503 by an indorsee in New York, and after a vigorous defense judgment at as recovered thereon for the full amount, with interest, and that judgment was paid (Cook v. State National Bank, 52 New York R., p. 96).
That case and the payment-of the judgment having settled the title to those certificates to have been in the State’National Bank, the latter commenced the present action July 22, 1879. Finding itself confronted by the statute of limitations, the claimant did not press the case for trial until Congress had passed the following act (1885, March 3, ch. 437, 23 Stat. L., 685):
“AN ACT for the relief of tlie State National Bank of Boston, Massachusetts.
uBe it enacted, etc., That the claim of the State National Bank of Boston for the sum of one .hundred thousand dollars in gold, deposited by said bank in the sub-treasury of the United States at Boston, Massachusetts, February twenty-eighth, eighteen hundred and sixty-seven, be and hereby is referred to the Court of Claims for its decision and adjudication upon the merits thereof as a court of equity and justice, without regard to the statute of limitations, according to the practice pf said court.
u Sec. 2. That said claim may be heard and determined by said Court of Claims on the petition of said bank now pending therein.
u Sec. 3. That there shall be the right of appeal from the finding and judgment of said Court of Claims to the Supreme Court of the United States, as in other cases.
“March 3, 1885.”
The title to the certificates deposited having been settled and the bar of limitation having been removed, there seems to be no defense to the principal claim. Every material point has been decided in favor of the claimant by this court and the Supreme Court in the former action between the same parties. These $100,000 certificates formed part of the $160,000 which were passed to HartAvell to exchange for gold, as set out in Finding XVIII, of which $60,000 were included in the former case, and the value thereof was recovered upon the judgment therein. In every particular between the present parties these $100,000 certificates and the $60,000 certificates were-passed into the sub-treasury under the same state of facts. This court and the Supreme Court having decided in favor of the claimant upon the $60,000 certificates, we must now do the same upon the $100,000 certificates.
*504 The claim for interest can not be allowed. Revised Statutes, section 1091, provides that—
“ No interest shall be allowed on any claini up to the time of rendering judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest.”
The gold certificates were payable on demand, without express stipulation for the payment of interest. There is nothing in the present case to take it out of the prohibition of the statute.
Judgment will be entered in favor of claimant for $100,000 in gold coin.